Paul ZUGEHOER, Defendant
Below, Appellant

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 635, 2008.

Supreme Court of Delaware.

Submitted: Aug. 12, 2009.
Decided: Sept. 1, 2009.

Nicole M. Walker, Esquire, Office of the Public Defender, Wilmington, DE, for Appellant.

Elizabeth R. McFarlan, Esquire, Department of Justice, Wilmington, DE, for Appellee.

Before STEELE, Chief Justice, JACOBS and RIDGELY, Justices.

JACOBS, Justice:

Paul Zugehoer, the defendant below, appeals from Superior Court final judgments of conviction of three counts of Home Improvement Fraud. Zugehoer makes two claims on appeal. First, he argues that his convictions must be vacated because (a) he was not charged with committing any acts amounting to criminal conduct and (b) the Superior Court declined to instruct the jury on fraudulent conversion, an essential element for a conviction of Home Improvement Fraud. Second, Zugehoer contends that he was improperly charged with three counts of Home Improvement Fraud under a statute that permitted the State to establish harm through one of three methods; therefore, the three counts should have been merged into a single count at sentencing. Although we find no error requiring that Zugehoer's convictions be vacated, we do conclude that the three counts of Home Improvement Fraud were legally merged into one. We therefore remand to the Superior Court for resentencing on a single count of Home Improvement Fraud.

## FACTS

Zugehoer owned and operated Absolute Equity, a contracting firm that specialized in the clean up and renovation of structures damaged by fire. On February 4, 2007, Paul and Christine Berkeley lost their three-story historic home, located in Middletown, Delaware, to a fire. Zugehoer had contracted with a firm that alerted him that a fire had been reported at the Berkeleys' home. A day or so after the fire, Zugehoer went to the Berkeleys' home and left his business card with someone at the house. Receiving no response to the card, Zugehoer returned to the property the next day, where he met with Mr. Berkeley and discussed potential renovations to the property.

Zugehoer and Mr. Berkeley spent considerable time that day assessing the damage and the work required to restore the house and the property. The Berkeleys had already obtained a renovation estimate from a Baltimore based contractor. Mr. Berkeley told Zugehoer that that estimate was well above the amount his insurance company would cover. Zugehoer assured Mr. Berkeley that because he had lower overhead costs than an out-of-state company, he could complete the renovations for the amount Mr. Berkeley's insurance carrier would pay.

On February 9, 2007, Mr. Berkeley signed a work authorization for Zugehoer to begin renovations, and the insurance company issued the first of a series of checks to rebuild the house. Zugehoer called the Berkeleys' insurance company to notify the insurer that he was the renovation contractor, verify the amount of coverage, and confirm that he needed a cash advance. On February 10, Mrs. Berkeley wrote Zugehoer a check for $30,000. Zu-

gehoer immediately began demolition work and sub-contracted with a company that specialized in repairing flood damage. Several days after Zugehoer began the project, he was issued a second check by the insurer in the amount of $100,000.

After renovations began, Zugehoer entered into a formal contract with the Berkeleys, which provided for an initial deposit of $105,000, followed by five monthly payments of $50,000, and a final payment of $66,000 at completion. The project was to be completed within one year. On February 22, the Berkeleys wrote Zugehoer a second check for $15,000, and on the following day they gave Zugehoer a check for $60,000. Those two checks, together with the February 10 check, comprised the initial $105,000 deposit. By the end of February, most of the demolition had been completed, emergency services had been provided, temporary electricity had been set up, and some initial plumbing and heating had been installed. At that point, the Berkeleys were pleased with the work being done on the project. Absolute Equity also furnished electricity and plumbing for a trailer and a barn on the Berkeleys' property for the couple to live in—a service not covered by the construction contract.

In March, Zugehoer fell behind schedule because of inclement weather, although he did complete additional demolition and erect some of the framing. On March 16, the Berkeleys paid Zugehoer $37,000, from which they deducted $13,000 to be deposited on kitchen appliances.

In April 2007, Zugehoer's crew continued framing the house and, by the end of the month, had installed plywood on the roof. The Berkeleys' made another $50,000 payment to Zugehoer, although that payment was a few weeks late. By then the Berkeleys had become concerned that the progress on the job was not commensurate with the money they had already paid to Zugehoer. The Berkeleys asked Zugehoer for an accounting summary of the project. In early May, Zugehoer gave the Berkeleys a summary sheet showing Absolute Equity's expenditures for materials and subcontractor fees. Mrs. Berkeley noticed inaccuracies, and asked Zugehoer for an accounting summary of the fund and the project. Zugehoer acknowledged that there were errors, and produced a second summary the next day. He did not, however, provide any receipts. The Berkeleys remained suspicious and contacted the subcontractors directly. To their dismay, the Berkeleys learned that most of the subcontractors had not been paid the amounts listed on Zugehoer's summary, and that Zugehoer still owed the subcontractors money.

It turned out that, in fact, Zugehoer had spent the money the Berkeleys paid him for personal items. In February 2007, Zugehoer spent almost $24,000 on personal expenditures, including a $3,000 ring for his wife. In March, Zugehoer purchased a Harley Davidson motorcycle. In April, Zugehoer's personal expenditures amounted to almost $50,000. In May, Zugehoer spent almost $15,500 on personal expenses. In all, from February through May 2007, Zugehoer spent nearly $130,000. By the end of May Zugehoer's personal and business bank accounts had either negative or minimal balances.

The Berkeleys contacted the architect, Joseph Turnowchyck, who offered to meet with Zugehoer and the subcontractors to discuss the status of the project. Zugehoer attended the meeting, which took place on either May 15 or 16, 2007, without knowing in advance that the subcontractors would be attending as well. Zugehoer left the meeting saying, "I'm out of here. You'll hear from my lawyer."

The Berkeleys then sent letters to Zugehoer and the subcontractors informing

them that they were "off the job." The Berkeleys hired another contractor to complete the renovations, and within a year, the project was completed for about the balance of the original contract with Zugehoer. Several subcontractors who had not been paid placed mechanics' liens on the Berkeleys' home, which required the Berkeleys to pay additional amounts in settlement of those claims.

On October 15, 2007, Zugehoer was arrested and indicted on four counts of Home Improvement Fraud and two counts of Writing a Bad Check Over $1,000. On April 17, 2008, the State entered a *nolle prosequi* to one count of Home Improvement Fraud and to both counts of Writing a Bad Check. The case went to trial that same day, but ended in a mistrial. The following week, the case was retried and the jury convicted Zugehoer of all three counts of Home Improvement Fraud. On December 12, 2008, the Superior Court sentenced Zugehoer to six years incarceration, suspended after one year for Level IV work release. This appeal followed.

### DISCUSSION

#### I. Zugehoer Was Properly Charged and the Jury Was Properly Instructed on the Essential Elements of Home Improvement Fraud.

■ Zugehoer contends that the indictment failed to charge him with conduct constituting a crime, an error that the Superior Court compounded by refusing to instruct the jury that it must find fraudu-

lent conversion to render Zugehoer's conduct unlawful. This Court "will review a refusal to give a 'particular instruction' (that is, an instruction is given but not with the exact form, content or language requested) for an abuse of discretion." [1] Because Zugehoer never raised below his claim that the indictment was defective for failure to charge criminal intent, that claim will only be reviewed on appeal for plain error.[2]

11 *Del. C.* § 916(b) contains five subsections that prescribe different methods by which home improvement fraud can be perpetrated.[3] The prefatory language of Section 916(b) incorporates the "intent" element for theft specified in 11 *Del. C.* § 841.[4] Section 841, in turn, sets forth two separate avenues to establish the requisite intent. Section 841(a) provides that "[a] person is guilty of theft when the person takes, exercises control over or obtains property of another person intending to deprive that person of it or appropriate it." [5] Section 841(b) states that "[a] person is guilty of theft if the person, in any capacity, legally receives, takes, exercises control over or obtains property of another which is the subject of theft, and fraudulently converts the same to the person's own use." [6]

Zugehoer claims that he should have been charged, and that the jury should have been instructed, under Section 841(b) rather than Section 841(a). That error, he argues, resulted in his being charged with conduct that is not unlawful, and in the

---

1. *Wright v. State,* 953 A.2d 144, 148 (Del. 2008).

2. *See Malin v. State,* 954 A.2d 910 (Table), 2008 WL 2429114, at *2 (Del.Supr. June 17, 2008) ("any objections to the form of an indictment are waived unless they are made prior to trial.").

3. *See* 11 *Del. C.* § 916(b)(1)-(5).

4. 11 *Del. C.* § 916(b) provides that: "A person is guilty of home improvement fraud who enters, or offers to enter, into a home improvement contract as the provider of home improvements to another person, and who with the intent specified in § 841 of this title: . . ."

5. 11 *Del. C.* 841(a).

6. 11 *Del. C.* 841(b).

failure to instruct the jury properly on an essential element of the crime. Specifically, Zugehoer argues that intending to appropriate money under a contract for the purpose of performing the contract is not unlawful. Rather, the crime of Home Improvement Fraud requires that the person "fraudulently convert" the property of another. Zugehoer asserts that as charged, he could be convicted of lawfully taking money, then negligently or recklessly failing to substantially complete the project, pay the subcontractors or divert funds, none of which is conduct targeted by Section 916 or is consistent with the statute's purpose.[7]

We conclude, for the following reasons, that Zugehoer's claims lack merit.

### 1. Zugehoer Was Properly Charged in the Indictment.

■ Zugehoer was charged with three counts of Home Improvement Fraud under 11 *Del. C.* § 916(b)(4). The indictment charged that Zugehoer "did take, obtain, or exercise control over with intent to appropriate or deprive the owner of United States currency in excess of $500 for the purpose of obtaining or paying for services, labor, materials or equipment and did fail to apply such money for such purpose by: [Count I] failing to substantially complete home improvement for which the funds were provided; [Count II] diverting said funds to a use other than that for which they were received; and [Count III] failing to pay for the services, labor, materials or equipment provided incident to such home improvement."

The indictment tracked the statutory language of Section 916(b)(4) and alleged the requisite intent under Section 841(a). Therefore, the indictment gave Zugehoer proper notice of the charges against him and properly stated the charges and intent under that statute.[8] Zugehoer's argument that the indictment failed to do so is contrary to, and ignores, the plain language of Section 916. Accordingly, there is no plain error necessitating further review. Zugehoer's argument is rejected.[9]

### 2. The Trial Court Properly Instructed the Jury.

■ The jury instructions were consistent with the indictment. After reading the relevant language of Section 916(b) verbatim, the trial judge instructed the jury on intent, consistent with Section 841:

> Now, in order to find the defendant guilty of Home Improvement Fraud you must find that all of the following elements have been established beyond a reasonable doubt.
>
> One, the defendant entered into a home improvement contract, to provide home improvements to Paul and Christine Berkeley.

---

7. When the legislature enacted § 916 it explained that the statute was designed to:

> [s]ubstantially increase the protection afforded to homeowners against dishonest and predatory home contractors. Currently, because of a number of loopholes in our criminal law, the hands of the police and the Attorney General's Office are tied in the face of complaints involving home improvement fraud. This is particularly true in cases involving elderly victims, who are often the target of the crime.

70 Del. Laws ch. 63 (1995) (H.B. 113).

8. *See State v. Deedon,* 189 A.2d 660 (Del. 1963).

9. *See Malloy v. State,* 462 A.2d 1088, 1093 (Del.1983) ("Such a long delay in [challenging the indictment] suggests a purely tactical motivation of incorporating a convenient ground of appeal in the event the jury verdict went against the [defendant]. Furthermore, the fact of the delay tends to negate the possibility of prejudice in preparation of the defense.") (quoting *United States v. Pheaster,* 544 F.2d 353, 361 (9th Cir.1976)).

Home improvement means any alteration, repair, addition, modification or improvement to any dwelling or the property on which it is located.

Home improvement contract is any agreement, written or oral in which a person offers or agrees to provide home improvement in exchange for payment of money, whether such payments have been made or not.

And the second element is that the defendant received money for the purpose of obtaining or paying for services, labor, materials or equipment, and failed to apply the money for this purpose by not substantially completing the requirements of the home improvement contract, or by not paying for the services, labor, materials, or equipment furnished to the home improvement project, or by diverting the money to some other use. And the third element is that the defendant intended to appropriate the money paid by Paul and Christine Berkeley under the home improvement contract or to deprive them of it—that is, it was the defendant's conscious object or purpose to take the money.

"Appropriate" means to exercise control, or to aid a third party to exercise control over property of another permanently or for so extended a period of time, or under such circumstances as to acquire a major portion of its economic value or benefit, or to dispose of property for the benefit of the actor or third person.

And the fourth and final element is that the contract price or amount paid by Paul and Christine Berkeley was $500 or greater.

Thus, the jurors were instructed that they must find beyond a reasonable doubt that Zugehoer failed to use the money he received from the Berkeleys to substantially complete the improvement project, pay the subcontractors or suppliers, and that he used the money for something else. The jury was also told that it must find that Zugehoer intended to deprive the Berkeleys of the value of their money.

Zugehoer has not shown how an instruction under Section 841(b)—that he "fraudulently convert[ed]" the money—would have assisted the jury. Section 916(b)(4) itself provides the jury with specific counts which presume that the defendant "fraudulently converted" funds for purposes of committing the offense. An instruction based on Section 841(b) would therefore be redundant.[10]

In *Edwards v. State*,[11] this Court rejected the suggestion that the jury should be instructed under the more generalized Section 841(b)[12] and "call[ed] upon the Delaware Legislature to eliminate the 'unnecessary' second paragraph of § 841 to remove the ambiguity created by that law...."[13] Accordingly, in Delaware, when the jury is instructed on the intent required by Section 841(b), the settled practice is to use the language of Section 841(a), rather than of Section 841(b).

**10.** *Edwards v. State*, 389 A.2d 267, 268 (Del. 1978).

**11.** *Id.* at 268.

**12.** "During the legislative history of this Code, an additional, apparently redundant, paragraph was added to § 841. This paragraph specifically covers the situation in which a person legally comes into possession of property and thereafter "fraudulently converts same to his own use." Unfortunately, the words "fraudulently converts" are not defined, and it is unclear what burden of proof of fraud there might be, or what constitutes conversion. These problems are not present in the first paragraph of § 841, which expressly covers such acts as embezzlement and conversion by a dishonest bailee, and uses only terms that are defined in this Code. Resort to the second paragraph should, therefore, be unnecessary." *Id.*

**13.** *Id.*

Here, the trial court ruled that the language—"with intent specified in Section 841"—was intended to incorporate only subsection (a), and not subsection (b) and so instructed the jury. The trial court properly instructed the jurors that they must find beyond a reasonable doubt that Zugehoer failed to use the money he received from the Berkeleys to substantially complete the improvement project, pay the subcontractors or suppliers, and that he used the money for some unrelated purpose.

## II. The Trial Court Committed Plain Error In Sentencing Zugehoer.

■ Zugehoer next claims that the State unlawfully subjected him to multiple charges based on the same underlying conduct. Zugehoer contends that he committed only one harm, and that although Section 916(b) permits the State to establish Home Improvement Fraud by one of the three methods, that does not allow the State to bring three separate charges. Because Zugehoer did not present this claim to the trial court, we review it for plain error. "This Court has previously held ... that a multiplicity violation may constitute plain error."[14] The State concedes that a multiplicity violation occurred here and that the case should be remanded for resentencing.

■ The multiplicity doctrine is one of the protections afforded by the Double

Jeopardy Clause of the United States Constitution.[15] The Double Jeopardy Clause protects a defendant against (i) successive prosecutions; (ii) multiple charges under separate statutes; and (iii) being charged multiple times under the same statute.[16] Under the multiplicity doctrine, the State is prohibited from "manufactur[ing] additional counts of a particular crime by 'the simple expedient of dividing a single crime into a series of ... units.'"[17] The courts have looked to legislative intent in determining whether the constitutional protection against Double Jeopardy permits multiple counts in a particular statutory setting.[18]

Section 916 was enacted "to substantially increase the protection afforded to homeowners against dishonest and predatory home contractors."[19] Section 916(b)(4) was originally enacted without subparts, but in 2000 it was amended by separating the paragraph into three subparts.[20] The amendment was intended to clarify that section to "make it clear that if the offender engages in any of the three delineated acts with intention to commit theft, he or she is guilty of home improvement fraud."[21] Consistent with that legislative intent, the trial court instructed the jury as to all three subparts of Section 916(b)(4).

The State may charge different theories of criminal liability for the same offense in a single indictment. Whether multiple

---

14. *Handy v. State*, 803 A.2d 937, 940 (Del. 2002) (citing *Williams v. State*, 796 A.2d 1281, 1284 (Del.2002)).

15. *See Sisson v. State*, 903 A.2d 288, 309 (Del.2006) (citing U.S. Const. amend. V; Del. Const. art. I, § 8); *Feddiman v. State*, 558 A.2d 278, 288 (Del.1989).

16. *Williams*, 796 A.2d at 1285.

17. *Handy*, 803 A.2d at 940 (one arson from one fire that harmed two victims was divided by the State to manufacture additional

counts, thereby violating multiplicity doctrine); *Williams*, 796 A.2d at 1284 (the court found only one possession with intent to distribute even though some drugs were found on the defendant and some were found in his home).

18. *Handy*, 803 A.2d at 941.

19. 70 Del. Laws ch. 63 (H.B. 113).

20. 72 Del. Laws ch. 462 (2000) (H.B. 557).

21. *Id.*

theories of criminal liability for the same offense are alleged in a single count or in multiple counts, the jury must (unanimously) decide which method—if any—was used to commit the alleged offense.[22] But where, as here, the jury unanimously finds that the defendant used multiple methods to commit a single offense, the multiple counts merge, and the trial judge may enter judgment only on one count.[23] Because the trial court sentenced Zugehoer for convictions of three separate counts, the court erred, as the State concedes.

### CONCLUSION

The judgment of conviction is affirmed, and the matter is remanded for merger and resentencing in accordance with this Opinion. Jurisdiction is not retained.

---

22. *Cf. Richardson v. State*, 673 A.2d 144, 147 (Del.1996) ("[L]isting two possible means [in one count] to satisfy an element of the offense presents a risk of less than a unanimous jury finding on that specific element.").

23. *Ball v. United States*, 470 U.S. 856, 865, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985) ("If, upon the trial, the district judge is satisfied that there is sufficient proof to go to the jury on both counts, he should instruct the jury as to the elements of each offense. Should the jury return guilty verdicts for each count, however, the district judge should enter judgment on only one of the statutory offenses."); *United States v. Gaddis*, 424 U.S. 544, 550, 96 S.Ct. 1023, 47 L.Ed.2d 222 (1976).