**IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY**

STATE OF DELAWARE,       )
                      )
                      )
                      )
       v.                )       Case No. 1507013159
                      )
                      )
CLINTON HARRIS,          )
                      )
       Defendant       )

Submitted:    March 17, 2017
Decided:     April 20, 2017

Amanda DiLiberto, Esquire
Deputy Attorney General
820 N. French Street, 7th Floor
Wilmington, DE 19801
*Attorney for the State of Delaware*

John X. Denney, Jr., Esquire
Mattleman, Weinroth, & Miller
200 Continental Drive, Suite 215
Newark, DE 19713
*Attorney for Defendant*

## DECISION AFTER TRIAL

By Information dated September 24, 2015, the State of Delaware brought an action against Clinton Harris (hereinafter the "Defendant"), which charges him with a number of sexual offenses across a span of years. On December 28, 2016, a non-jury trial was convened on the matter and concluded on December 30, 2016. After the conclusion of the trial, the Court requested additional briefing and reserved decision. This is the Court's final decision after trial.

## LEGAL STANDARD

After a verbal colloquy with the Court, the Defendant elected to waive his right to a jury trial, and the case was tried as a bench trial. As such, the Court sat as the sole trier of fact. Therefore, it is the Court's responsibility to assess the credibility of the testifying witnesses and, where there is a conflict in the testimony, to reconcile these conflicts, "if reasonably possible[,] so as to make one harmonious story."[1] In doing so, the Court takes into consideration the demeanor of the witnesses, their apparent fairness in giving their testimony, their opportunities in hearing and knowing the facts about which they testified, and any bias or interest that they may have concerning the nature of the case.[2] Because the Defendant has conceded the State met its *prima facie* case, the sole matter before the Court is whether the State proved each element of each offense beyond a reasonable doubt.[3]

## FACTS AND PROCEDURAL HISTORY

At trial, the Court heard from five witnesses. The first two witnesses, Sandra Bufano (hereinafter "Bufano") and Kerricia Marino Scholl (hereinafter "Scholl"), are the alleged victims. The third witness, Detective Nicholas Terranova (hereinafter "Detective Terranova"), is the chief investigating officer in this matter. The fourth witness, Deborah Jastrebski (hereinafter "Jastrebski"), is the Chief Executive Officer of Practice Without Pressure. Finally, the Defendant testified on his own behalf. The facts of this matter have been subject to significant dispute, controversy, and contradiction, including inconsistencies within the testimony of single

---

[1] *Nat'l Grange Mut. Ins. Co. v. Nelson F. Davis, Jr.*, 2000 WL 33275030, at *4 (Del. Com. Pl. Feb. 9, 2000).
[2] *State v. Westfall*, 2008 WL 2855030, at *3 (Del. Com. Pl. Apr. 22, 2008).
[3] *See* 11 *Del. C.* § 301.

witnesses. Therefore, in its capacity as the sole trier of fact, the Court will recite the relevant facts as it found them to exist, based upon the credibility of the witnesses.[4]

The entirety of the incidents in question occurred at or in connection with Practice Without Pressure (hereinafter "PWP"), a non-profit organization designed to serve individuals with disabilities. PWP was planned by Jastrebski and the Defendant in 2002 and began operations in 2005, with Jastrebski acting as the Chief Executive Officer and the Defendant acting as the Chief Operations Officer. Both individuals acted in their respective official roles throughout the events in question.

Initially, PWP's operations occurred within Jastrebski's home in Bear, Delaware. Bufano began working for PWP in 2005 as a volunteer, and over time advanced to doing administrative work, and eventually served as an operations manager and director of support services. In 2005, Bufano and the Defendant began working together, interacting in a manner similar to typical coworkers. The interactions remained cordial and professional, without extending into any sort of personal friendship or contact outside of work. The first notably uncomfortable experience between the Defendant and Bufano occurred at a dental conference in August of 2008, when the Defendant noticed and commented that Bufano was not wearing her wedding ring.[5] Bufano found this to be odd and uncomfortable, particularly when the Defendant began touching Bufano's hand suggestively.

In 2009, PWP began making plans to move from Jastrebski's home and into a designated facility in Newark, Delaware. Renovations began on the property, including the creation of a parking lot capable of holding approximately ten vehicles, and had largely concluded by September of 2009. Later that month, on September 21, the Defendant and Bufano both had

---

[4] For the sake of clarity, the credibility of each witness will be addressed *infra*.
[5] Bufano testified to prior instances of uncomfortable conduct, such as inappropriate hugs. However, the August 2008 incident was of greater significance to Bufano.

3

occasion to be on the property at the same time; despite the prior uncomfortable experiences and lack of personal friendship, they decided to take a tour around the property in a backhoe. The Defendant, who had to operate the backhoe with his hands and his feet, was seated in the sole chair within the cabin; Bufano was thus sitting partially or wholly on the Defendant's lap throughout the ride.

In February of 2011, Scholl began working for PWP as a secretary. She was eventually given additional responsibilities, but was never elevated to a supervisory rank. Initially, Scholl was punctual, organized, and completed her work without difficulty. During her first year at PWP, Scholl had few interactions with the Defendant, yet noticed from her first such interaction the Defendant was inclined toward uncomfortable displays of affection.[6] However, given the Defendant's infrequent visits to the PWP building, Scholl did not have any particularly negative feelings toward the Defendant during that first year – an opinion that quickly changed as Scholl entered her second year of employment.

On February 27, 2012, Scholl and the Defendant were alone in PWP when the Defendant sat down in the waiting room and asked questions about Scholl's life. The conversation led to Scholl discussing her personal life, including her ongoing difficulties with her ex-husband; in particular, Scholl went into details on how her ex-husband was dating a new woman and had even sent Scholl pictures of his new girlfriend. Scholl, who described herself as a nervous talker, eventually divulged details about herself, such as how she was a boring person.[7] The Defendant came over to Scholl and gave her a full-bodied hug, much to Scholl's surprise and discomfort. During the embrace, Jastrebski unexpectedly walked through the room. Later that evening, the

---

[6] Specifically, Scholl testified the Defendant rubbed her back on their first meeting – an occurrence that took Scholl by surprise.
[7] The example Scholl used was paraphrased from a comment made by Scholl's ex-husband: the ex-husband had described himself as NASCAR and Scholl as a flat tire.

4

Defendant called Scholl and advised the two should get their stories straight as to what had occurred.

Following the incident with the hug, the Defendant initiated and maintained a sexual relationship with Scholl, which lasted until sometime around June 27, 2012. The Defendant admitted to and even provided details on most, but not all, of the alleged sexual encounters, yet maintains the encounters were consensual. The sexual relationship began with an incident that occurred on March 5, 2012, when Scholl was working in a cubicle.[8] The Defendant approached Scholl and began asking sexually suggestive questions, leading to a discussion about oral sex.[9] The Defendant proceeded to stand up, undo his pants, and press his exposed penis against Scholl's face; Scholl responded by freezing up and not reacting in any way.

Scholl testified she entered what she described as her "own little world," a mechanism she had employed as a child to withstand abuse from her father. She explained that she experienced the events in an out-of-body manner – physically present but mentally and emotionally elsewhere. Scholl contends that she did not agree to or want the Defendant's actions, but did proceed to place the Defendant's penis in her mouth. Scholl's testimony did not indicate she attempted to communicate her lack of consent to the Defendant. Eventually, Scholl and the Defendant went into another area of PWP, where the Defendant pulled down Scholl's pants and began to touch her.[10] Due to Scholl's dissociation techniques, she testified she was unable to recall any specific details beyond her own sense of being violated and general details of her location.

---

[8] There is some dispute as to whether Scholl worked in a cubicle or at a desk in an open area of the waiting room. The Court finds this to be a distinction without a difference, as the Defendant himself admitted that several sexual encounters occurred while other individuals were inside the building – the existence or inexistence of a cubicle or an independent desk is therefore irrelevant.

[9] The Defendant maintains he had overheard Scholl and others discussing preferred sexual activities, and admitted to repeatedly asking Scholl about her proclivities.

[10] Scholl believes this occurred in the haircut practice room; however, the Defendant testified there was no such thing as the haircut practice room. The Defendant acknowledged the incident occurred, only disputing the location.

5

Following this incident, Scholl gave the Defendant a flash drive containing various photographs of Scholl.[11] The photographs had been taken a few years previously, at a time when Scholl felt uncharacteristically happy with her physical appearance. The photographs depicted Scholl in lingerie, which Scholl has since characterized as inappropriate.[12] Despite her reservations, Scholl provided the Defendant with these photographs; specifically, Scholl sought to justify the Defendant's actions against her and to convince herself she was worthy of the Defendant's abuse and attention.[13] After Scholl provided the Defendant with the pictures, the sexual encounters increased in frequency; while the Defendant testified to numerous such encounters, which the State did not dispute, the Court only heard detailed testimony about five additional occurrences.

The first such incident began on an unspecified day when Scholl wore a skirt to work – an unusual occurrence, and one that only happened because PWP was expecting an important visitor that day. The Defendant approached Scholl, commented approvingly on her choice of attire, and began touching Scholl inappropriately. The Defendant eventually led Scholl to the wheelchair ramp within the PWP building; the ramp was approximately seven feet from a door leading into the main room, and it was specifically chosen by the Defendant as a place for sexual intercourse because it was daring. The Defendant positioned Scholl on her back, with the Defendant on top of her, and engaged in vaginal sexual intercourse. Scholl, who did not wholly

---

[11] Neither the Defendant nor Scholl could recall exactly when the flash drive was provided.

[12] The Defendant described the pictures in more detail, indicating that Scholl was in more racy attire than lingerie. The State did not challenge this characterization, but the Court finds the distinction immaterial. Scholl admitted to providing the Defendant with photographs of herself in revealing outfits.

[13] The Court is troubled with the psychological implications of Scholl's testimony on this matter. However, because the Court did not hear any expert testimony on the subject, the Court will afford these implications appropriate weight based upon the Court's lay understanding.

disassociate from the events, was nevertheless uncomfortable and fearful during the encounter. According to Scholl, she did not consent and said "no."[14]

The next incident occurred when Scholl was on the phone with the parent of a client. Scholl was the only person in the PWP building at the time; the Defendant drove into the parking lot, left his vehicle running, and entered the building. Upon encountering Scholl, the Defendant began touching Scholl and eventually had vaginal intercourse with Scholl from behind. Scholl testified she wanted to protest, but because she was on the phone with a distraught parent, she did not offer any sort of resistance or communicate her lack of consent to the Defendant. Scholl acknowledged she never communicated her unwillingness to have sex, claiming she could not verbalize either consent or an objection because she was on the phone. The Defendant was evasive regarding this event, but did admit to having sex with Scholl in this manner. The Defendant maintained that having sex while Scholl was on the phone was something he and Scholl had previously discussed as an exciting roleplay fantasy.

Another incident occurred when there were other people in the PWP building, as the presence of nearby coworkers reportedly added to the danger and allure of the sexual encounter. Due to the favorable weather, the other employees were outside on the patio, while Scholl and the Defendant remained inside. Scholl approached the restroom, only to find the Defendant blocking the doorway, preventing Scholl from going through the door. The Defendant placed his hand down Scholl's pants, inside her underwear, and began touching Scholl's genitals. Scholl told him to stop, and then proceeded to return to her desk. The Defendant denies this event in its entirety. According to Scholl, she vocalized her lack of consent, thereby successfully ending this encounter.

---

[14] While Scholl testified she was certain she said "no," the Court did not hear any circumstances or context for this statement. The Court is unable to determine Scholl's tone, volume, or other such factors, and does not know whether the Defendant ever heard Scholl say "no."

7

On a different date, the Defendant called Scholl into Jastrebski's office. The office was small; with the door closed, there was scarcely enough room to move around. After Scholl entered the office, the Defendant closed the door and proceeded to have vaginal intercourse with Scholl from behind. While Scholl indicated she protested against this encounter, she did not specify how her lack of consent was conveyed to the Defendant or in what context, and could not recall the precise words used. Her testimony was simply that she made it clear to the Defendant she did not want the sexual contact. Afterward, Scholl sent an email over the PWP server to the Defendant telling him to stop and that she was uncomfortable. The Defendant became angry and berated Scholl for risking discovery by sending the email on the PWP server.

The final incident occurred in the basement of the PWP building. Scholl had begun making a concerted effort to avoid the Defendant, yet could not always do so. On this occasion Scholl had been called down to the basement by the Defendant.[15] The Defendant told Scholl he wanted to have sex with her; Scholl testified she refused. According to Scholl, the Defendant then exposed his penis and pulled Scholl forward, choking her as the Defendant forcibly received oral sex from Scholl. Finally, the Defendant ejaculated on the floor, scuffed it with his shoe, and told Scholl he was done with her and to go back upstairs. The Defendant disputes this event ever occurred, and instead testified the relationship ended when Scholl informed the Defendant she wanted to stop because she intended to become more seriously involved with her then-boyfriend.

On June 27, 2012, Scholl received a call from her doctor advising her she may have been exposed to hepatitis C. Scholl was upset, interrupted a meeting between Bufano and Jastrebski, and told both of them about the phone call, to which Bufano responded by offering to drive Scholl to the doctor's office. While in the car, Scholl told Bufano about everything that had occurred between herself and the Defendant, including the lack of consent and her belief she had

---

[15] The Defendant admits to several encounters with Scholl in the basement but denies this event occurred.

8

been exposed to hepatitis C by the Defendant.[16] After returning to the PWP building that same day, Scholl spoke with Bufano and Jastrebski, advising the latter about the Defendant's actions. Later that evening, Scholl received phone calls from the Defendant, which Scholl refused to answer. The Court heard the voicemails left by the Defendant checking up on Scholl. Scholl testified the Defendant had never called to check up on her previously.

Initially, Jastrebski was supportive, and allowed Scholl to take a week off from work to see a therapist. Jastrebski had advised Scholl and Bufano that the Defendant would no longer be in the PWP building.[17] However, sometime later, Jastrebski became hostile and combative, going so far as to ask Scholl if Scholl intended to hire a lawyer and to press charges. When Scholl advised she had no intention of doing so,[18] Jastrebski ordered Scholl and Bufano to refrain from discussing the matter again.

In July of 2013, a break-in occurred at the PWP building. While there was no indication of forced entry, the perpetrator destroyed some property within the building. The only damage was to the computer monitors of Scholl and another employee, Courtney, whom Scholl suspected to be another victim of the Defendant's unwanted sexual advances. Prescription pads were also reportedly stolen from the building. Following this incident, security cameras were installed within the PWP building by the Defendant.[19] Scholl resigned shortly after the installation of the cameras, in part due to her fear of the Defendant.

---

[16] Scholl did not ultimately contract hepatitis C.

[17] There are differing accounts as to whether the Defendant voluntarily stayed away or was barred from the premises; however, the witnesses generally agree the Defendant was not in the office for a period of time after June 27, 2012.

[18] Scholl was adamant in her support of PWP's mission and her own refusal to hinder that mission through legal action.

[19] Scholl believed the Defendant used the cameras to watch Scholl and others. While the Court accepts the Defendant installed and likely knew how to operate and view the cameras, the Court cannot conclude the Defendant actively surveilled Scholl or anyone else. However, the Court accepts Scholl's belief as to the Defendant's alleged actions as motivation for Scholl to resign from PWP.

9

The final incident in this matter occurred on September 18, 2014 in the parking lot of the PWP building.[20] The Defendant arrived at the PWP building and began speaking with Bufano in the parking lot; Bufano wanted to know why the Defendant had come to the building, leading to an argument between the two individuals. Finally, Jastrebski walked out of the building and into the parking lot, at which time she and the Defendant each got into their own vehicles and left the premises. Following this incident, Bufano wrote a formal letter of complaint to Jastrebski and asked for an investigation into the Defendant's contact with Scholl, while also asking for the Defendant's access to the building to be restricted. Bufano was laid off from PWP shortly after this occurred.

Approximately two years after resigning from PWP, and more than three years from the last sexual encounter between the Defendant and Scholl, Scholl learned of additional distressing allegations about the Defendant's behavior, leading Scholl to report her allegations to the police, where Scholl came into contact with Detective Terranova. Detective Terranova is employed by the Delaware State Police and works in the major crimes unit, where he has performed approximately fifty investigations of sex crimes over the previous eight years. Detective Terranova interviewed Scholl and recognized her demeanor, affect, manner of speaking, and other such factors as being consistent with someone who has been sexually assaulted. During his investigation, Detective Terranova contacted Jastrebski, who declined to speak to Detective Terranova without first consulting the PWP board and an attorney. Jastrebski never contacted Detective Terranova again.

On August 26, 2015, the Defendant was arrested and charged with a single count of Sexual Harassment. On September 24, 2015, the Defendant was charged by information with one count of Sexual Harassment and eight counts of Unlawful Sexual Contact in the Third

---

[20] The Court heard no less than five versions of this incident during the testimony of three witnesses.

10

Degree. That same day, the Defendant filed a Rule 10 Arraignment by Written Pleading and entered a plea of not guilty with respect to the charge of Sexual Harassment. The State filed a Superseding Information, which alleged one (1) count of Sexual Harassment, occurring on or about September 18, 2014.[21] The Superseding Information further alleged eight (8) counts of Unlawful Sexual Conduct in the Third Degree, with one incident occurring on or about August 20, 2008, another on or about September 21, 2009, and the remaining six (6) incidents occurring between March 1 and July 31, 2012.[22]

## CREDIBILITY OF THE WITNESSES

In its capacity as the sole trier of fact, the Court was obligated to evaluate the credibility of each witness. Because this matter is concededly one in which credibility is the primary determining factor, the Court will address its specific findings of credibility.

### a. Sandra Bufano

Bufano was the first witness to testify. On direct examination, Bufano presented as confident, levelheaded, and controlled, while her testimony was reasonably clear. However, even with incidents that occurred years prior, Bufano was able to recite certain statements and actions with almost unwavering clarity. This clarity was not only for the more egregious of incidents, but also for the occasions that may have been uncomfortable but not otherwise noteworthy at the time. Bufano also presented as having an excellent memory of the ride on the

---

[21] The information alleged the Defendant "did threaten to engage in conduct likely to result in the commission of a sexual offense against Sandra Bufano or suggest, solicit, request, importune, or otherwise attempt to induce to have sexual contact with the actor, knowing that the actor is thereby likely to cause annoyance, offense, or alarm to that person." The Court issued an interim order from the bench on April 21, 2016, granting a partial dismissal of Count I and limiting the State to continue on the theory the statement constituted a threat against Bufano.

[22] Counts II through IX alleged that the sexual contact occurred "knowing that the contact was either offensive to the victim or occurred without the victim's consent." Count II, which allegedly occurred on or about August 20, 2008, was ultimately dismissed by this Court.

backhoe in 2009, yet opined the Defendant had been standing behind her and bumped into her repeatedly. [23] Given that operating the backhoe required the Defendant to use his hands and feet, her description is physically impossible. While the Court found no indication Bufano was lying about the incident, the factual impossibility of her version of events renders the Court unable to credit her testimony above that of the Defendant.

On cross examination, Bufano became argumentative and seemed reluctant to agree with the questions presented by defense counsel. After significant questioning, Bufano eventually changed her testimony regarding her personal feelings toward the Defendant. Initially, Bufano insisted she did not hate the Defendant, but rather, she hated what he had allegedly done to her. However, toward the end of her testimony, Bufano admitted she hates the Defendant for everything he has done to her, to Scholl, and to other, unnamed individuals.

Bufano also notably changed her story regarding the September 18, 2014 incident in the parking lot. On direct examination, Bufano stated the Defendant had been speaking to another employee; Bufano was worried for the safety of this other employee and came out to see if everything was okay. On cross examination, Bufano stated the Defendant came into the building to talk to Bufano, and she only went outside because her coworker, Jackie Armstrong, was busy working in their office and Armstrong had declined to leave. But then, when the conversation moved to the parking lot, Armstrong accompanied Bufano and the Defendant. Bufano's demeanor during both recitations was largely the same, casting significant doubts on Bufano's overall credibility. Again, the Court does not find these errors to indicate deceit; however, even

---

[23] Furthermore, the Court heard conflicting testimony on who initiated the backhoe ride. Irrespective of its genesis, the Court does not understand why Bufano would agree to such an excursion. The Court recognizes the possibility of Bufano acting to preserve her career, yet cannot reconcile that possibility with Bufano's own testimony. Bufano vigorously denied being afraid of the Defendant, insisting she was angry rather than fearful. The Court does not believe Bufano to be lying about the backhoe incident, but simply cannot reconcile her depiction with other parts of her testimony. When the evidence rests in equipoise, the balance must tip in favor of the accused.

12

an ambivalent finding of credibility would be insufficient to support proof beyond a reasonable doubt.

The Court finds Bufano generally lacked credibility with respect to any specific utterances or occurrences. Based upon Bufano's demeanor, while testifying under oath, her inconsistent testimony, and her admitted bias against the Defendant, the Court finds Bufano's testimony is reliable for the purposes of corroborating larger themes and events, but it is unreliable for proving actual conduct. When compared with the Defendant's credibility on his interactions with Bufano, the evidence is in equipoise. In such an event, the Court is obligated to resolve doubts in favor of the accused.

### b. Kerricia Marino Scholl

Scholl was the second witness to testify, and also provided the greatest volume of testimony. The Court made numerous observations of Scholl's appearance on the witness stand. Scholl was distraught, shaking, emotional, and, at times, fearful; her demeanor, affect, and manner of speaking were all in harmony and appropriate for the events Scholl was recounting. Scholl began crying on numerous occasions, and even when she was able to control herself, the emotion in her voice was palpable and corroborated by her physical appearance.

During both direct and cross examination, Scholl was candid about her own perceived flaws, including her lack of self-esteem, her difficulties with body image, her self-perception as boring and unworthy of love or attention, and her poor judgment in taking and distributing racy photographs of herself. Scholl was also particularly candid about the limitations of her memory. Scholl testified she did not recall any specific details after the beginning of her first sexual

13

encounter with the Defendant, while also grounding her lack of recollection in the coping mechanisms she learned while suffering from abuse as a child.[24]

When questioned by defense counsel, Scholl's demeanor did not noticeably change. Rather than avoid embarrassing facts, Scholl went into greater detail when prompted. However, Scholl did have some minor degree of hostility when confronted with a proffer of contradictory testimony from another witness.[25] The Court was impressed and noted that, when questioned by the defense, Scholl made a concerted effort to be helpful in answering questions; she made no attempts to evade questions, no matter how difficult, and seemed invested in the honest pursuit of the truth.[26] The Court was further impressed by Scholl's impassioned defense of PWP. Scholl rejected out of hand any suggestion that she seek civil remedies because she did not want to see PWP or the people it serves hurt.

The Court finds Scholl to be generally credible. Based upon Scholl's demeanor, her apparent fairness in giving testimony, her opportunity for knowing the facts upon which she testified, and her lack of bias, the Court finds Scholl's testimony to be generally credible and reliable. The Court notes Scholl, as an alleged victim, has a strong personal interest in the matter. It is an interest in emotional closure and protection for any potential victims in the future. The Court does not find any indication of malice or deceit. However, the Court is troubled with certain actions and events discussed by Scholl. This concern is less focused on Scholl's own credibility and more on the State's lack of expert testimony to justify certain

---

[24] While the Court accepts Scholl's testimony on her coping mechanisms, the Court is unable to accept the coping mechanism as substantial evidence of Scholl's lapses in memory or her reactions to the alleged incidents. Absent expert testimony corroborating Scholl's testimony and guiding the Court on how such a coping mechanism would impact Scholl, the Court is not in the appropriate position to give credence to complex psychological testimony.

[25] When questioned on whether Jastrebski or the Defendant might say the sexual occurrences were consensual, Scholl responded forcefully and said they would be lying if they testified as such.

[26] The Court notes, however, Scholl was unable or unwilling to voluntarily offer any details or to use any descriptive language concerning the sexual actions taken against her, and was in fact led through the events by the State's questioning. However, the Court does not know whether this was the result of psychological distress, shyness, or actual recalcitrance.

14

portions of Scholl's testimony. While Scholl did not herself do anything wrong or ultimately cause the Court's concerns, these doubts must inevitably weigh against the State.

### c. Detective Nicholas Terranova

Detective Terranova was the third and final witness for the State. While the Court does not find any particular defects in Detective Terranova's testimony or credibility, the Court does find the testimony to be of limited value. The most relevant testimony occurred when Detective Terranova provided several conclusions, based upon his training and experience, concerning how Scholl presented during the initial interview. The Court accepts those opinions as credible, particularly given Detective Terranova's experience investigating major crimes, including sex crimes. Detective Terranova's observations and evaluations of Scholl buttress and validate the Court's own observations of Scholl during the trial.

### d. Deborah Jastrebski

Jastrebski was the first witness called by the Defendant. On direct examination, Jastrebski presented as arrogant and callous, even when faced with allegations of significant sexual misconduct by the chief operations officer of a company in which Jastrebski is heavily invested.[27] Jastrebski's answers on direct examination were unwavering, and often included flat denials of any sort of misconduct by the Defendant. When questioned by the State, Jastrebski was highly combative, argumentative, and evasive. Jastrebski attempted to avoid answering a question regarding her relationship with the Defendant until finally admitting she had a sexual encounter with the Defendant herself.[28] Jastrebski refused to be pinned down by the State on

---

[27] Jastrebski has invested over a decade of time into PWP and had initially created PWP to assist her son. Jastrebski's investment is therefore both temporal and emotional.

[28] At one point during this line of questioning, Jastrebski attempted to justify her recalcitrance by stating she never had a sexual "relationship" with the Defendant, as characterized by the State, because a single event does not

15

even the most innocuous of matters. When presented with questions based upon previous testimony, Jastrebski would give such responses as "I have no opinion on that" – even when the question was phrased as whether Jastrebski would be surprised to hear a certain claim of fact. Jastrebski denied the backhoe could have been on the premises and denied that event ever happened, despite the Defendant himself admitting to some version of the occurrence transpiring.

As with Bufano, Jastrebski ultimately changed her testimony regarding the September 18, 2014 incident in the parking lot.[29] According to Jastrebski's testimony, 1) she was present for the majority of the conversation between Bufano and the Defendant; 2) the entire conversation was innocuous; and 3) it lasted for approximately five minutes. However, when presented with a letter she herself had written documenting the incident, Jastrebski changed her testimony to say she had been looking out the window for approximately fifteen minutes, periodically observing the conversation but unable to hear what was said, and then went into the parking lot. Jastrebski still maintained she was outside for more than seven and a half minutes. Even when confronted with the fact that she could not have been present for much of the conversation, Jastrebski characterized Bufano as lying about the Defendant's statements.

Jastrebski's testimony must be considered in light of the fact that she knew the Defendant, the second highest officer in PWP, was having a sexual relationship with one of PWP's most junior employees, and by Jastrebski's own testimony Jastrebski did nothing about it. Even with the benefit of hindsight, Jastrebski did not appear at all concerned about the

---

constitute a relationship. The Court found this to be indicative of Jastrebski's unwillingness to cooperate with the State's questioning.

[29] Even beyond the inconsistencies, the Court is perplexed by what was intended to have occurred. Jastrebski asserted the Defendant had come to PWP to pick up Jastrebski's son, take the son to Jastrebski's house, and then Jastrebski would pick up her son and go to court with her son and the Defendant. However, within fifteen minutes of the Defendant arriving at PWP, Jastrebski was ready to go and was worried about being late. Her son left with Jastrebski and not the Defendant. Moreover, it was never explained why her son needed a ride with the Defendant, since Jastrebski was present. The Court finds this to be another example of Jastrebski contriving events apparently to protect the Defendant, justifying his presence at PWP.

16

relationship while testifying, and acted as though it were trivial. Jastrebski even admitted she had advised Scholl and Bufano to avoid spreading any "gossip" about the incidents. The Court is troubled by Jastrebski's blasé attitude toward the actions of PWP's chief operations officer and Jastrebski's willingness to chastise anyone but the Defendant regarding what transpired.

Relatedly, Jastrebski testified she had immediately termed the sexual encounters between the Defendant and Scholl an "affair," which Jastrebski defined as a consensual sexual relationship. Nevertheless, Jastrebski proceeded to ask *both* Scholl and the Defendant *whether the relationship was indeed consensual*. Jastrebski could not explain why she would ask if it was consensual if it was an affair.

Based upon Jastrebski's inappropriate demeanor, her obvious lack of fairness in giving testimony, her opportunity for knowing the facts upon which she testified, her willingness to testify about incidents of which she could not have known,[30] her bias toward her longtime friend, business associate, and onetime sexual partner, her outright hostility toward Bufano and characterization of Bufano as a liar,[31] and her vested interest in avoiding any embarrassment to PWP, the Court finds Jastrebski to be wholly without credibility and affords her testimony no weight. The Court found Jastrebski's testimony shocking. Furthermore, the internal logic of Jastrebski's actions is significantly in question. The flaws in Jastrebski's testimony are insurmountable with respect to her own credibility; however flawed Jastrebski's testimony, she is not the defendant in this matter. Moreover, her lack of credibility and potential liability cannot be transferred to the Defendant.

---

[30] The Court explicitly notes Jastrebski's continued attempts to testify about what was said during the incident in the parking lot, even when it became apparent Jastrebski lacked the ability to overhear the majority of the conversation.
[31] The Court recognizes Scholl characterized Jastrebski and the Defendant as lying if they were to describe the sexual encounters as consensual. However, the Court distinguishes these characterizations on the subject matter. Scholl was responding to a contradiction of her own mental state, or lack thereof, and her ultimate choices. Jastrebski was responding to a sequence of events that happened to someone else at a time when Jastrebski was admittedly not present. The Court's focus is not on the *label* of being a liar, but rather, the *reason* for the label.

17

### e. Clinton Harris

Finally, the Defendant elected to testify on his own behalf. Initially, the Defendant presented as calm and collected. However, as the Defendant went into details regarding his sexual relationship with Scholl, the Defendant's affect became more casual and, in some respects, more excited. The Court found the Defendant seemingly enjoyed recounting the times and places he had sexual intercourse with Scholl. It appeared to the Court as though the Defendant was eager to discuss his sexual exploits in public;[32] the Defendant went from telling about the incidents to boasting about them. The Court is disturbed by the pleasure evident in the Defendant's voice and demeanor during such testimony, particularly given the gravity of the proceedings; however, the Court notes pleasure in discussing one's sexual exploits does not suggest a lack of truthfulness.

The Defendant's testimony included his alleged observations and opinions regarding Scholl. The Defendant described Scholl as sexually adventurous, while also testifying Scholl did not have low self-esteem; relatedly, the Defendant suggested Scholl's preference for roleplaying was a driving force behind the "scenarios" testified to during the trial. The Court found the Defendant to take great satisfaction in describing the code allegedly employed by Scholl to initiate sexual activity. His testimony regarding Scholl's self-esteem left the Court incredulous, as did his testimony on Scholl instigating and directing the nature of the sexual encounters.

During his testimony, the Defendant attempted to provide a motive for Bufano's dislike of the Defendant. He testified the relationship between himself and Bufano had been rocky for five or six years and only became outright hostile when Bufano went on medical leave. During

---

[32] The Court notes this excitement is consistent with the Defendant's appetite for "daring," adventurous, and somewhat exhibitionist sexual encounters. The Defendant admitted to engaging in sexual intercourse at times and places where there was a risk of being caught, while also testifying he found those activities attractive because of the daring nature of such encounters.

18

that time, the Defendant reportedly conducted an audit of Bufano's work and discovered approximately $52,000.00 in unbilled accounts receivables.[33] Despite the significant sum of alleged unbilled accounts, the Defendant never documented the audit in any way, referenced the results in Bufano's employee file, reprimanded Bufano, or made any other permanent record of the issue. The Defendant justified not taking any employment action against Bufano because the errors were related to systems and were not Bufano's fault. Despite admitting Bufano was never reprimanded for the errors, the Defendant maintained this was Bufano's reason for disliking the Defendant. The Court is perplexed by the logic of this conclusion and is equally nonplussed about why the Defendant, in his capacity as the chief operations officer of a non-profit organization, would decline to document such a significant audit. The Court finds the Defendant's testimony to be a fabrication, created in an attempt to discredit Bufano, and wholly without credibility.

On cross examination, the Defendant was evasive and argumentative. By way of example, when asked whether the Defendant was a supervisor, the Defendant initially advised he was not a supervisor. The Defendant then stated he was not Scholl's direct supervisor, and finally admitted he was, in fact, a supervisor. The Defendant would frequently quibble with the State over terminology or characterization.

Based upon the Defendant's disturbing demeanor, his apparent lack of fairness in giving testimony, and his gross mischaracterizations of Scholl, the Court finds the Defendant to have limited credibility. The Defendant's testimony on general background events, such as the chronology of PWP, is credible but limited. The Court remains concerned with the potentially blurred line of consent as described by the Defendant, as the Court finds the Defendant

---

[33] On direct, the Defendant testified the amount was $52,000.00, but on cross he stated the amount as being close to $50,000.00. The Court finds the precise amount to be immaterial.

19

knowingly took advantage of Scholl's vulnerabilities; however, exploiting an emotional vulnerability does not mean, *per se*, the sexual acts met the statutory definition of "without consent."[34]

## DISCUSSION

The Defendant stands charged with one count of Sexual Harassment (Count I) and seven counts of Unlawful Sexual Contact in the Third Degree (Counts III through IX). Sexual Harassment is defined in relevant part as "threaten[ing] to engage in conduct likely to result in the commission of a sexual offense against any person[.]"[35] Unlawful Sexual Contact in the Third Degree occurs "when the person has sexual contact with another person or causes the victim to have sexual contact with the person or a third person and the person knows that the contact is either offensive to the victim or occurs without the victim's consent."[36] Due to the nature of the allegations and the evidence produced at trial, the Court will focus its discussion on the methods of proving Unlawful Sexual Contact in the Third Degree. The Court will also reserve applying the law to each charged offense until after discussing what the law entails.

### I.    Alternative Methods of Proving a Criminal Offense

In his supplemental briefing to the Court, the Defendant stated the following: "While the defense sought the State to elect and particularize their basis for going forward with these charges, the trial testimony and argument of the State had made clear that the State elected to

---

[34] While the Court is suspect of the Defendant's testimony on Scholl's involvement and consent, the Court must note the State nevertheless bears the burden of proving the contact occurred "without consent," as defined by the Delaware Code. The Court's inability to give full credit to the Defendant's testimony on the issue of consent does not in and of itself satisfy the State's burden.
[35] 11 *Del. C.* § 763.
[36] 11 *Del. C.* § 767.

20

claim that the sexual contact was unlawful because it is alleged it was without consent."

Conversely, the State wrote the following in its supplemental brief:

> [T]he State would also like to take this opportunity to emphasize that it is not *required* to prove beyond a reasonable doubt that the alleged sexual contact occurred "without the person's consent." Instead, the State is required to prove *either* that the alleged sexual contact occurred "without the person's consent" *or* that the alleged sexual contact was "offensive to the person."

On September 26, 2016, this Court ruled on the Defendant's Motion to Dismiss.[37] In the Motion, the Defendant had argued the State erred by charging the Defendant in the disjunctive.[38] The Court held as follows:

> Both the Delaware and the United States Supreme Courts have long held charging in the disjunctive is permissible. In analyzing the history of such charging decisions, the Delaware Supreme Court noted "It was a historical practice and continues to remain a common practice to list in one count of an indictment alternative means with respect to an element of a crime." Furthermore, neither the information nor the bill of particulars serves to force the State to adopt one or another method of proving its case; the State may go about proving the elements of the alleged offense as it sees fit, provided adequate notice has been given. This Court finds the information sufficiently apprises the Defendant of what the State may prove in demonstrating its case. Therefore, the mere fact of charging in the disjunctive is not fatal.[39]

The State is permitted both to charge in the disjunctive and to proceed to trial under either theory or both theories. There is no requirement for the State to charge in the disjunctive and then elect a singular approach once the trial begins. Furthermore, the mere fact of the State focusing on one approach over the other does not preclude the trier of fact from finding the State has met its burden on either theory. According to the Delaware Supreme Court,

---

[37] *State v. Harris*, 2016 WL 5867433 (Del. Com. Pl. Sep. 26, 2016) (Danberg, J.).
[38] The Defendant sought to require the State to charge the Defendant with unlawful sexual contact that was either offensive or without consent.
[39] *Harris, supra*, at *6 (citations omitted).

21

[t]he State may charge different theories of criminal liability for the same offense in a single indictment. Whether multiple theories of criminal liability for the same offense are alleged in a single count or in multiple counts, the jury must (unanimously) decide which method – if any – was used to commit the alleged offense. But where . . . the jury unanimously finds that the defendant used multiple methods to commit a single offense, the multiple counts merge, and the trial judge may enter judgment only on one count.[40]

The State will not be penalized for focusing on one method over another when the Defendant was placed on notice of both theories in advance of trial. The only concern is whether the Defendant was on notice and whether the evidence bears out the legal theory – not whether the State referenced or argued for the theory. Accordingly, the Court will consider both avenues of determining whether the Defendant is guilty of Unlawful Sexual Contact in the Third Degree.

## II.  Offensiveness of the Contact

Unlawful Sexual Contact in the Third Degree can occur when the Defendant has sexual contact with another person while knowing the contact is offensive to the victim.[41] The *actus reus* is thus the contact, while the requisite *mens rea* is that of knowledge of the offensiveness to the victim. It is therefore insufficient to show merely the offensiveness to the victim, as the defendant must *know* the contact is offensive to the victim. There is little Delaware precedent concerning the application of this language; accordingly, the Court will look to decisions from other states with similar statutes.

In Pennsylvania, a prior version of the statute criminalizing "indecent contact" required the Commonwealth to prove "the actor knew his contact would be offensive to the victim."[42] In *Mumma*, the Pennsylvania Supreme Court found the defendant's conduct in disguising the

---

[40] *Zugehoer v. State*, 980 A.2d 1007, 1013-14 (Del. 2009) (citations omitted).
[41] 11 *Del. C.* § 767.
[42] *Commonwealth v. Mumma*, 414 A.2d 1026, 1029 (Pa. 1980). While the statute has since been amended, the Court's analysis is nevertheless relevant.

22

purpose of his actions to indicate knowledge of the offensiveness of the sexual contact.[43] However, a dissenting opinion suggested the Commonwealth was required to prove the defendant "intended to accomplish the acts against the will of the victim."[44]

In Ohio, the crime of "sexual imposition" may be proven when "[t]he offender knows that the sexual contact is offensive to the other person, or one of the other persons, or is reckless in that regard."[45] Ohio courts have stated the unlawful contact "is not a sexual contact that might offend most of persons with whom the offender may engage regardless of his purpose. The statute here limits unlawful contact where the offender knows the effect of which is offensive to a given person."[46] However, unlike the Delaware statute, the Ohio statute allows liability when the defendant acts recklessly, as opposed to acting with knowledge. In *State v. Birkman*,[47] the defendant was convicted under a theory of offensiveness, despite having testified to frequent horseplay and sexual banter between the defendant and the victims.[48]

In *State v. Kuritar*,[49] the defendant was likewise convicted under the Ohio statute. In *Kuritar*, the defendant and the victim were both at the home of another individual; both were drinking, but there was no flirtation or private conversation or contact between the two.[50] After everyone in the house went to sleep, the victim awoke to find the defendant fondling her breast.[51] The victim rolled onto her side and away from the defendant, only for the defendant to pull down

---

[43] *See id.*
[44] *Id.* at 1031.
[45] R.C. § 2907.06(A)(1).
[46] *State v. Orban*, 1985 WL 4939, at *3 (Oh. App. Dec. 31, 1985).
[47] 621 N.E.2d 1266 (Ohio Ct. App. 1993).
[48] *See id.* at 786. The victims both testified they resisted the contact. *See id.*
[49] 2012 WL 3637407 (Ohio Ct. App. Aug. 24, 2012).
[50] *See id.* at
[51] *See id.* at *2.

the victim's pants and underwear and begin fondling the victim's genitals.[52]  As stated by the Ohio court,

> Although the victim never told Kuritar to stop, she had not given him 'any indication that [she was] receptive to this.' The victim testified that she froze because:
>
>> I guess I was afraid of what might have happened if I were to have moved or did something different. I don't know. I just remember being scared and almost like I was so scared my body just tensed up and I – like I couldn't think.[53]

The defendant also admitted to the contact, while stating he knew he should not be touching the victim.[54]

On appeal, the defendant argued "there is [in]sufficient evidence that he either knew that his conduct was offensive, or was reckless in that regard."[55]  In upholding the conviction, the Ohio court found:

> The venue, and the drinking games, could have been appropriate to flirtation leading up to sexual activity. But there is no indication in this record that any flirtation occurred, or that anything occurred that would have led [the defendant] to conclude that his touching the breast of a sleeping woman, whom he had just met that night, and with no history of expressed sexual interest between them, would be less than offensive.
>
> Furthermore, [the defendant]'s written statement: "knowing that I shouldn't be doing this," creates a strong inference – certainly a reasonable one – that he knew that his touching the victim's breast would be offensive to her.

In the case at bar, the State argued in its supplemental briefing "it is not necessary that the State prove that these incidents occurred 'without consent,' so long as the State can prove that Defendant's actions were offensive to the victims." This statement of the law is incorrect. The

---

[52] *See id.*
[53] *Id.*
[54] *See id.* at *3.
[55] *Id.*

focus is not on whether the contact was indeed offensive, but whether the Defendant *knew* the contact was offensive. By way of illustration, partners in a long-term, committed sexual relationship may believe, whether correctly or incorrectly, a given contact would not cause offense to the other person. That same person may know an identical action would be offensive to a stranger. In this scenario, both victims may find the contact offensive, but only the latter contact would fall under the offensive theory of the statute.

As suggested by the cases from Pennsylvania and Ohio, knowledge of offensiveness to the victim will often be inferred from the circumstances surrounding the conduct at issue. Barring an admission from a defendant, the State will seldom possess definitive proof of what the defendant knew concerning the victim's response to the contact. As opposed to cases involving possession or conspiracy, knowledge in this situation likely cannot be inferred from the existence of any particular object or course of conduct. Whereas a defendant in close proximity to drugs or weapons may be presumed to know of such contraband, such circumstances are not equivalent to sexual contact. Logically, any intentional sexual contact will occur because the actor either knew – and did not care – the contact was unwanted, and therefore offensive, or because the actor believed the contact was welcome, and therefore not offensive. A further complication arises when the circumstances or testimony suggest the actor never considered whether the contact may be offensive; such a mental state may be reckless, but it would not rise to the level of culpability in Delaware.

In *Birkman* and *Kuritar*, two cases from Ohio, the courts took note of any flirtation between the defendant and the victim(s). The implication is simple: flirtation, sexual innuendo, or positive responses to sexual advances may cause an actor to believe the contact was welcome. While such conduct on the part of the victim does not equal consent, the focus on the first option

25

of proving the criminal offense is focused exclusively on the defendant's knowledge. Interestingly, in *Birkman*, the defendant was convicted in spite of testimony concerning sexual banter, thereby suggesting the presence of prior flirtation is not controlling.

Turning to the matter *sub judice*, there is no indication of prior reciprocal flirtation between the Defendant and Bufano, nor did the circumstances suggest the Defendant would have any reason to believe sexual contact, if such occurred, would be anything but offensive. Concerning Scholl, the Defendant testified Scholl had initiated the majority of the sexual encounters. If believed, then the Defendant cannot be found to have known the contact was offensive. However, according to Scholl, the Defendant was an unwanted aggressor. Prior to the first alleged sexual contact, the Defendant and Scholl had discussed sexual topics while at work. Following the initial incident, Scholl admitted to providing the Defendant with racy photographs. Scholl and the Defendant were then involved in an ongoing sexual relationship, albeit one Scholl alleges was nonconsensual; this relationship complicates the issue of the Defendant's knowledge.

In light of the above, the question of whether the Defendant knew the sexual contact was offensive to Scholl will likely turn on the same facts that would give rise to a determination of the contact occurring without Scholl's consent. The first incident, prior to the commencement of the relationship – whether consensual or nonconsensual – is the only circumstance where the Defendant's knowledge is distinguishable from Scholl's alleged lack of consent. Once the relationship began, the two theories of culpability necessarily merge, as the State cannot prove – under these circumstances – the Defendant's knowledge without first proving Scholl communicated her lack of consent.

### III.    "Without Consent"

The second method of proving Unlawful Sexual Contact in the Third Degree requires the State to prove the contact occurred without the victim's consent.  Delaware has defined "without consent" in relevant part as follows:

> The defendant compelled the victim to submit by any act of coercion as defined in §§ 791 and 792 of this title, or by force, by gesture, or by threat of death, physical injury, pain or kidnapping to be inflicted upon the victim or a third party, or by any other means which would compel a reasonable person under the circumstances to submit. It is not required that the victim resist such force or threat to the utmost, or to resist if resistance would be futile or foolhardy, but the victim need resist only to the extent that it is reasonably necessary to make the victim's refusal to consent known to the defendant[.][56]

Because there are no allegations in the case *sub judice* of kidnapping, threats of violence, or other such factors commonly associated with compelling a victim to submit to unwanted sexual contact, the Court will limit its discussion to factors of potential relevance.

### a.    Coercion

The first method of proving compulsion is through evidence of coercion.  Coercion has been defined in relevant part as:

> when the person compels or induces a person to engage in conduct which the victim has a legal right to abstain from engaging in, or to abstain from engaging in conduct in which the victim has a legal right to engage, by means of instilling in the victim a fear that, if the demand is not complied with, the defendant or another will . . . [p]erform any other act which is calculated to harm another person materially with respect to that person's . . . career[.][57]

The State argues both Bufano and Scholl feared their careers would be harmed if they did not submit to the Defendant's alleged actions.  However, as with knowledge of offensiveness,

---

[56] 11 *Del. C.* § 761(j)(1).
[57] 11 *Del. C.* §§ 791 and 791(8).

the focus is less on the victim and more on the Defendant. Under the plain language of the statute, the act must not only instill fear, but it must also be "calculated to harm another person[.]"

There is only one incident where the Defendant allegedly threatened either alleged victim with employment consequences: the discussion in the parking lot. However, this event only concerned Bufano, and occurred approximately five years after the alleged sexual contact between the Defendant and Bufano. Neither Bufano nor Scholl testified to any threats of employment consequences from the Defendant before or during the alleged incidents.[58] While the Court is willing to assume, *arguendo*, Bufano and Scholl sincerely feared their jobs would be at risk if they took any actions against the Defendant, the fear of such consequences alone does not constitute coercion.

Furthermore, while the existence of a power differential within the business may suggest coercion, under the plain language of the statute, there must be conduct *calculated* to harm another; mere status is not calculation. While a Chief Operations Officer engaging in an affair with an underling, particularly a non-management employee, would most likely be inappropriate, such inappropriateness does not equate to coercion without evidence of calculation. Despite the State's assertion the Defendant "used this power to prey on his employees," the State has not cited any case law – whether in Delaware or elsewhere – supporting such a broad definition of coercion. The fact of the Defendant being in a position of power does not override the specific intent contemplated by the term "calculated."

---

[58] The testimony was generally consistent as to Bufano and Scholl's perception of the Defendant and his alleged actions as inappropriate, uncomfortable, and somewhat threatening. However, neither witness testified to any explicit or implied coercive threats, despite having concerns over their careers.

28

### b. Force or Any Other Means of Compulsion

The Delaware code does not provide a precise definition of "force" as it is used to define "without consent." However, Delaware case law has established force can be minimal. As summarized by the Superior Court,

> physical actions of the alleged victim's arms being crossed against her chest and being held down in a relatively slight way, but in an affirmative determined way by the defendant . . . results to sufficient force or gesture that would compel a reasonable person under the circumstances to submit.[59]

There is little other guidance on what constitutes sufficient force. However, the Court is satisfied the catchall phrase "by any other means which would compel a reasonable person under the circumstances to submit" would obviate any need to establish a precise boundary of necessary force. Assuming, *arguendo*, the Court accepts the testimony of Bufano and Scholl, such testimony would establish the requisite means. While not rising to the level of coercion, the power differential between the Defendant and the alleged victims creates a circumstance where a reasonable person would likely submit.[60] Furthermore, and as discussed *infra*, the Defendant's alleged tendency to make unbidden, unexpected contact with the alleged victims would all but necessitate submission in such instances. It is impossible to avoid submitting to contact that occurs without the victim anticipating or expecting the contact. In the first incident between the Defendant and Scholl, Scholl testified the Defendant unexpectedly placed his penis against her face; Scholl could not help but submit to this contact as it was entirely unexpected.

---

[59] *Johnson v. State*, 929 A.2d 784, fn 12 (Del. 2007) (table) (quoting the Court below).

[60] By way of further explanation, the Court was unable to find the alleged victims' assertions of fear to establish coercion, as the focus of coercion is on the intent of the actor. However, when examining means that would compel a reasonable person to submit, the focus is properly on the "reasonable person," as opposed to the Defendant, and therefore susceptible to testimony of actual, reasonable fear of harmful repercussions.

### c. Manifesting Lack of Consent

The final statutory consideration in determining whether contact occurred "without consent" is whether the alleged victim resisted "to the extent that it is reasonably necessary to make the victim's refusal to consent known to the defendant[.]"[61] Due to the general lack of clear Delaware precedent defining what constitutes an adequate manifestation of lack of consent, the Court will examine the Delaware case law and then look to decisions from other jurisdictions. The Court notes the decisions from many jurisdictions are unavailing, as several states permit culpability in the absence of affirmative consent, rather than upon some manifestation of the victim's lack of consent.[62]

In *Johnson v. State*,[63] the victim was a fifty-two-year-old woman with mental disabilities.[64] The defendant began photographing and touching the victim's breasts before fondling her genitals; the victim "screamed" and told the defendant "to stop and repeated "no" several times[.]"[65] However, while ruling on the defendant's motion for judgment of acquittal, the trial judge noted "the victim had severe intellectual and mental limitations. And for such a person I think a lesser showing of refusal to consent would satisfy[.] [T]hat might not carry the day in a case where a victim has no intellectual limitations."[66] The Supreme Court ultimately upheld the convictions.[67]

---

[61] 11 *Del. C.* § 761(j)(1).

[62] *See generally In re Welfare of A.H.J.*, 2004 WL 1444936 (Mn. App. Jun. 29, 2004) ("Minnesota law does not require that nonconsent be communicated before the sexual contact occurs or that it be communicated at all."); *Oregon v. Neubauer*, 162 P.3d 1044 (Or. App. 2007) ("The jury could credit the victim's explanation that, although she did not protest, neither did she agree to perform oral sex[.]").

[63] 929 A.2d 784 (Del. 2007) (table).

[64] *Id.*, at *1.

[65] *Id.*

[66] *Id.*, fn 12.

[67] *Id.* at 4.

In *Clark v. State*,[68] the defendant was thirteen years old, while the victim was fifteen years old; while inside the victim's home, the defendant made several advances toward the victim and attempted to kiss her.[69] The victim repeatedly told the defendant to stop.[70] After the victim went into her bedroom and closed the door, the defendant, unbidden, opened the door, walked in, closed the door behind him, and attempted to kiss the victim again.[71] The defendant began groping the victim, prompting her to repeatedly tell the defendant to stop.[72] The Supreme Court found the State met its burden of proving the contact occurred without the victim's consent, as the victim made repeated efforts to end the contact and told the defendant to stop.[73]

In Idaho, a prosecution for rape requires the State to prove the victim resisted, but does not define the requisite amount of resistance.[74] Idaho courts found the resistance does not need to be physical resistance and only needs to demonstrate the victim's non-consent.[75] One Idaho court held:

> whether the evidence establishes the element of resistance is a fact-sensitive determination based on the totality of the circumstances, *including the victim's words* and conduct. We note that this standard is not a "reasonable" resistance standard which determines the reasonableness of a victim's resistance against an objective standard of reasonableness. Such an approach is problematic because it defeats the very rationale that brought about its existence (in a progression from the utmost resistance standard), which is the fact that not every victim reacts similarly to rape. It is very difficult, if not impossible, to quantify how a rape victim would react under "same or similar circumstances." Rather, the standard we apply includes consideration of the victim's individual characteristics in determining whether she exhibited legally recognizable resistance.[76]

---

[68] 957 A.2d 1 (Del. 2008) (table).
[69] *Id.* at *1.
[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *Id.* at *3.
[74] *See State v. Jones*, 2011 WL 4011738, at *5 (Idaho Ct. App. Sep. 12, 2011). The Idaho statute, codified under I.C. § 18-6101, has since been amended. However, the statute retains the language of rape occurring, *inter alia*, when "the victim resists but the resistance is overcome by force or violence."
[75] *See id.* at *7.
[76] *Id.*

However, on appeal of the *Jones* case, the Idaho Supreme Court reversed one of the convictions for rape. While one conviction was upheld because the victim repeatedly yelled and told the defendant to stop, another was overturned because the victim feigned sleep and did not respond to the defendant's actions.[77] The Idaho Supreme Court summarized the problem as follows:

> By her own admission, [the victim] "didn't respond" physically, or even verbally, to [the defendant's] advances on May 28 – she "just froze." Idaho's forcible rape statute expressly requires resistance. Satisfying this element with inactivity strains the definition of resistance, essentially nullifying the resistance requirement. Though studies have shown that "freezing up" is indeed a legitimate, understandable reaction of victims of sexual assault, this Court has no authority to jettison the resistance requirement – modifying this State's statutes is the Legislature's province alone. As the statute is plainly written, some quantum of resistance is required, and [the victim] did not resist [the defendant's] advances[.][78]

As with Delaware, Nebraska has a statutory definition of "without consent," which has been used to analyze convictions for sexual assault. "Without consent" means:

> (a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor;
> (b) The victim need only resist, either verbally or physically, so as to make the victim's refusal to consent genuine and real and so as to reasonably make known to the actor the victim's refusal to consent; and
> (c) A victim need not resist verbally or physically where it would be useless or futile to do so[.][79]

---

[77] *See State v. Jones*, 299 P.3d 219, 227-30, (Idaho 2013).
[78] *Id.* at 229-30.
[79] Neb. Rev. St. § 28-318(8).

In *State v. Foltz*,[80] the Nebraska Court of Appeals upheld a conviction for sexual assault after applying the above definition. In *Foltz*, the victim

> testified that she was asleep in her bed and woke up with her pants pulled down to her ankles and [the defendant] thrusting his erect penis between her legs and against her vagina, while fondling her breast. When she realized what was happening, she expressed her lack of consent by telling [the defendant] to get out of her bed. She expressed her lack of consent through words, which is sufficient[.][81]

In *State v. Smith*,[82] the Connecticut Supreme Court noted the requirement of some form of evidence, discernible by the defendant, showing the victim's lack of consent:

> [W]hether a complainant has consented to intercourse depends upon her manifestations of such consent as reasonably construed. If the conduct of the complainant under all the circumstances should reasonably be viewed as indicating consent to the act of intercourse, a defendant should not be found guilty because of some undisclosed mental reservation on the part of the complainant. Reasonable conduct ought not to be deemed criminal.[83]

The foregoing cases all suggest the State must provide some quantum of evidence suggesting the victim made overt actions implying a lack of consent. Notably, Delaware's statute requires these manifestations to "make the victim's refusal to consent known to the defendant[.]"[84] Each of the foregoing cases involved the victim making some specific utterance, whether it was "no," "stop," or some form of command; the only case not involving such an utterance was *Jones*, in Idaho. *Jones* is consistent with the other cases, however, because the Idaho Supreme Court *overturned* a conviction when the victim feigned sleep instead of manifesting a lack of consent – thereby finding the conviction could not stand in the absence of such a manifestation. However, in *Johnson*, the Superior Court suggested screaming and

---

[80] 2014 WL 815478 (Neb. Ct. App. Mar. 4, 2014).
[81] *Id.* at *7.
[82] 554 A.2d 713 (Conn. 1989).
[83] *Id.* at 717.
[84] 11 *Del. C.* § 761(j)(1).

33

repeatedly telling the defendant to stop may be insufficient for an adult with ordinary mental faculties and capabilities.

Based upon the Delaware precedent and the analysis from jurisdictions with similar definitions of "without consent," the Court finds the State is required prove the victim, through words or conduct, demonstrated a lack of consent sufficiently that the Defendant was able to recognize the lack of consent. This is neither a subjective nor an objective standard, but instead utilizes considerations from both standards. While the subjective knowledge of a defendant could inform what precise manifestation would be sufficient,[85] there are certain actions which would inform any reasonable person of the victim's lack of consent.[86] Whether the defendant should have known of the lack of consent must be based upon the totality of the circumstances, in light of the relationship between the parties, and with the recognition of any prior understandings or agreements between the parties.[87]

---

[85] By way of example, the parties may agree upon a "safe word," the utterance of which would require the other to cease his or her actions. Uttering the word may not inform a reasonable person of a lack of consent to continue, but would inform the defendant in such a scenario.

[86] The most prevalent example would simply be the word "no." However, as noted in *People v. Denbo*, *infra* at note 90, people often do things during the course of sexual activities that would otherwise indicate a refusal to continue. Even the words "no" and "stop" may not be intended to communicate a lack of consent in the proper circumstances. Accordingly, there must be a sufficient quantum of evidence to show the words were intended as a literal command, rather than as an appropriate and welcomed part of the sexual act.

[87] As stated by the New Jersey Supreme Court,

> Men and women express their feelings and desires in many different ways, from the demonstrative and unequivocal to the subtle and suggestive. Communications in the most mundane matters may have many layers of meaning. Interpreting language and conduct concerning our passions and affairs of the heart may be no easier than deciphering hieroglyphics. Some remarks, if taken literally will mean one thing, and if taken in jest another, and if taken half-in-jest, both one thing and another. Unraveling the riddle of the messages we convey through body language and the spoken word requires a high degree of discernment, for often there are surface and underlying meanings.

*New Jersey v. Garron*, 827 A.2d 243, 258-59 (N.J. 2003).

### d. Consent During a Course of Conduct

The final matter concerning lack of consent is what effect, if any, an ongoing relationship has on consent. According to the Defendant, he and Scholl had engaged in a continuous, consensual sexual relationship for several months. If the Court were to accept the Defendant's contention, but ultimately concluded Scholl withdrew her consent at some point during the relationship, then the Court must determine what manner of proof is sufficient to demonstrate withdrawal of consent. As noted *supra*, the subjective expectations and understandings of a defendant may inform the reasonableness of the manifestation of a lack of consent. A continuous sexual relationship may have relaxed standards of consent, understood and accepted by the parties, which would require a greater degree of proof to overcome in the event consent is withdrawn. Therefore, the Court will consider precedent from other jurisdictions relating to withdrawal of consent in both a single sexual encounter and during the course of an ongoing relationship to explore the contours of the relevant law.

As a preliminary matter, many states permit an individual to withdraw consent prior to and during a previously-consented-to sexual act.[88] However, the ability to withdraw consent is not limitless, as "rape may occur even though consent was given to the initial penetration, but *only if* the consent is withdrawn, that withdrawal is communicated to the defendant, and the sexual intercourse continues when the victim is overcome by force or fear."[89]

In *People v. Denbo*,[90] an Illinois court considered whether the victim communicated her withdrawal of consent by pushing on the defendant's shoulders. While the victim "no longer

---

[88] *See generally State v. Baby*, 946 A.2d 463, 486 (Md. 2008) ("Based upon the foregoing analysis, we hold that a woman may withdraw consent for vaginal intercourse after penetration has occurred and that, after consent has been withdrawn, the continuation of vaginal intercourse by force or the threat of force may constitute rape.").

[89] *State v. Flynn*, 329 P.3d 429, 438 (Kan. 2014). The language of continuation "when the victim is overcome by force or fear" is not as widely recognized as the requirement of communication.

[90] 868 N.E.2d 347 (Ill. App. 2007) (emphasis added).

35

consented, her withdrawal of consent was ineffective until she communicated it to defendant in some objective manner so that a reasonable person in defendant's circumstances would have understood that [the victim] no longer consented."[91] The court found a single push to be insufficient communication because "people push one another during sexual congress. We do not mean to suggest that a push can never signify nonconsent or a withdrawal of consent. . . . The significance of various factors – a cry for help, level of resistance, attempt to escape – depend[s] on the circumstances of each case."[92]

Withdrawal of consent becomes murkier when removed from a single sexual encounter and placed within the context of an ongoing sexual relationship. In *State v. Xay Vang*,[93] a North Carolina court examined a case where a husband raped his wife. Evidence was presented suggesting the defendant had made previous assaults and threats against the victim, leading up to threats and coercion forcing the victim into sexual acts.[94] These circumstances were sufficient to find the sexual acts occurred without the victim's consent.[95] The court based its ruling in part upon *State v. Alston*,[96] a case from the North Carolina Supreme Court.

In *Alston*, the Court discussed the issues surrounding withdrawal of consent:

> If the particular act of intercourse for which the defendant is charged was both by force and against the victim's will, the offense is rape without regard to the victim's consent given to the defendant for prior acts of intercourse.
>
> Whereas here the victim has engaged in a prior continuing consensual sexual relationship with the defendant, however, determining the victim's state of mind at the time of the alleged rape obviously is made more difficult. Although inquiry in such cases still must be made into the victim's state of mind at the time of the alleged rape, the State ordinarily will be able to show the victim's lack of consent

---

[91] *Id.* at 358.
[92] *Id.*
[93] 2016 WL 1743107 (N.C. App. May 3, 2016).
[94] *See id.* at *5.
[95] *See id.*
[96] 312 S.E.2d 470 (N.C. 1984).

to the specific act charged only by evidence of statements or actions by the victim which were clearly communicated to the defendant and which expressly and unequivocally indicated the victim's withdrawal of any prior consent and lack of consent to the particular act of intercourse.[97]

There is no question a victim may withdraw consent regardless of any prior or current relationship with the defendant.[98] What little guidance exists in other jurisdictions suggests the proof of such withdrawn consent is fundamentally identical to all other manifestations of a lack of consent. The course of conduct may create broader ambiguities based upon prior experience, thereby increasing the difficulty of meeting the burden of proof, but does not alter the necessity of basing withdrawal of consent on the attendant circumstances. Therefore, the Court will take into consideration what, if any, bearing the prior sexual contact between the Defendant and Scholl may have had on later incidents, based upon the totality of the circumstances.

### e. Futility

Delaware does not require resistance "if resistance would be futile or foolhardy[.]"[99] The Court has not found any Delaware case law defining futility in the circumstance of unwanted sexual contact. Merriam-Webster defines futile as "serving no useful purpose; completely ineffective." Several states appear to consider futility as being limited to circumstances where size differential, violence, and/or threats render a victim unable to offer resistance.[100] Therefore,

---

[97] *Id.* at 407-08.

[98] *See Everson v. State*, 2008 WL 2548843, at *6 (Tex. Crim. App. Jun. 26, 2008) ("[T]he intimate relationship between appellant and the complainant at the time of the sexual intercourse does not, by itself, preclude an implied finding of nonconsent[.]").

[99] 11 *Del. C.* § 761(j)(1).

[100] *See generally People v. Parker*, 2016 WL 7508099, at *6 (Ill. App. Dec. 29, 2016) (the victim "testified that she resisted [the defendant's] efforts to first remove her clothing, then cried and asked him to stop performing oral sex on her, but that he continued to do so for approximately ten minutes, only stopping "when he felt like it." It can reasonably be inferred from this testimony that physical resistance to [the defendant] would have been futile."); *State v. Mendez*, 487 S.W.3d 66, 70 (Mo. App. 2016) ("evidence of past abuse as well as the threatening manner in which Appellant held the hammer above Victim's head was relevant under the circumstances to help the jury understand why Victim did not resist and that her lack of resistance did not indicate consent, but rather indicated she was under duress."); *State v. Carter*, 160 So. 3d 647, 654 (La. App. 2015) ("all that is necessary is that the victim be

37

without any further guidance on the proper definition, the Court will accept the conclusions of other jurisdictions in finding futility to be in reference to some form of threatening circumstances. Futility in this context is further informed by its pairing with the term "foolhardy," thereby suggesting the victim must fear any resistance would result in some form of additional harm or would utterly fail in compelling the aggressor to stop.

## ANALYSIS

The Court recognizes a casual reader, limited to the Court's dispassionate recitation of the facts, may conclude Scholl actually and actively consented to the alleged sexual acts discussed *supra*. However, based upon the Court's observations of Scholl during the trial, including her emotional state, fragility, discomfort, and physical affect and mannerisms, coupled with Scholl's candid testimony, her discussion of coping mechanisms she has employed since childhood, and her consistency in testifying, the Court finds Scholl likely did not consent to any of the incidents. The greatest problem stems from Scholl's vulnerabilities and defense mechanisms, to which the State did not provide expert testimony to explain the nuances of how such things influenced Scholl's actions. Without expert guidance, the Court is left with reasonable doubts as to the nature of Scholl's consent and lack thereof.

While Scholl's testimony may indicate an unwilling participant who ultimately acquiesced to sexual activities, the Court is unable to reconcile her stated lack of consent with her actions. Although Scholl may not have consented in the lay understanding of the term, Delaware does not recognize a wholly subjective, intrinsic lack of consent as meeting the statutory definition applicable to the charged offenses. Further, the Court emphasizes mere

---

*prevented from* resisting by force or threats of physical harm to such an extent that she *reasonably believed* resistance to be futile."); *but see State v. Juan C.*, 2017 WL 33756, at *12 (Conn. Ct. App. Jan. 10, 2017).

acquiescence to an unwanted sexual act, after manifesting a lack of consent, is insufficient to override a previous lack of consent without a corresponding shift in mental state, there must first be some manifestation of Scholl's lack of consent.[101] Scholl's current testimony of her lack of consent is at odds with her actions at the time. For the following reasons, the Court finds the State failed to prove the elements of any of the charged offenses beyond a reasonable doubt.

### a. Knowledge of Offensiveness of the Contact

The first method for proving Unlawful Sexual Contact in the Third Degree requires the Court to consider whether the Defendant knew the contact would be offensive to the alleged victims. The Court finds the State failed to meet its burden of proof on this theory. On the first incident with Scholl, in which the Defendant allegedly placed his penis against Scholl's face, the fact of prior sexual banter creates a reasonable doubt as to the Defendant's knowledge.[102] For all subsequent incidents, the Court finds Scholl manifested sufficient sexual interest – primarily through sending the Defendant racy photographs of herself – to create a reasonable doubt as to whether the Defendant knew further contact was offensive to Scholl. Furthermore, the Court did not hear any compelling testimony of any circumstances suggesting a lack of overall sexual interest until Scholl sent the email following the incident in Jastrebski's office. Any prior instances where Scholl dissuaded the Defendant from pursuing her could be construed as limited to the particular event or day in question, rather than to the ongoing relationship. Even the email could have been construed as limited to having sex in the public areas of PWP. These reasonable doubts preclude the Court from finding the State met its burden.

---

[101] As per 11 *Del. C.* § 761(j)(1), resistance by the victim is only required "to the extent that it is reasonably necessary to make the victim's refusal to consent known to the defendant[.]" Once that threshold has been met, the Court is satisfied no further resistance is necessary.

[102] The Court notes Scholl was not obligated to inform the Defendant of her lack of consent or to make such lack of consent known prior to the act. However, because this method of proving the offense is strictly focused on the Defendant's knowledge, the lack of additional circumstances creates doubt as to what the Defendant knew or believed.

39

### b. Manifesting a Lack of Consent

The remaining statutory issue for the Court is whether the State proved Scholl adequately manifested her lack of consent. For all but the final two incidents, assuming the Court accepts Scholl's testimony, the State failed to meet its burden of proof. On the first incident, Scholl testified she froze, disassociated, and passively complied with the Defendant's actions. While the Court is sympathetic to the trauma Scholl experienced as a child, and ultimately believes Scholl does, in fact, utilize the specified defense mechanism, the evidence introduced at trial does not allow the Court to evaluate this response in any way. There was no expert testimony confirming this response is even possible, let alone one Scholl would likely employ. There was also no expert testimony suggesting this response would prevent Scholl from manifesting her lack of consent. The Court cannot utilize its own experience to fill in gaps that should properly be explained by an expert, nor can it assume facts not in evidence.

Concerning the incident on the wheelchair ramp, Scholl testified she said "no" to the Defendant. However, Scholl's statement was devoid of context, containing only the assertion she "knows [she] said no." The State did not follow up on this answer to explore when and how Scholl said no, how loud she said it, whether she was laughing or crying while saying it, or even whether it appeared the Defendant heard her say it. As suggested by our sister courts, the State must prove the manifestation of Scholl's lack of consent was sufficient to put the Defendant on notice of the need to stop.[103] The Court accepts "no means no," but maintains the State's burden is not to prove the word was said, but rather that it was actually communicated to the Defendant in a suitable manner.

---

[103] The Court recognizes there may be resistance to the idea of analyzing an alleged victim's response to a sexual offense to determine if the response was "adequate." However, it is the responsibility of the legislature to create the applicable laws and definitions; this Court is bound by the plain language of the statutory definition.

This same analysis may apply to the incident in Jastrebski's office; Scholl testified she could not remember the specific words, but said such things as "no" and "not a good idea." Without more context, the Court is concerned it cannot reach the conclusion of whether the words alone were sufficient to meet the statutory definition. Aside from context, there is a concern regarding timing. Assuming, *arguendo*, Scholl made a clear and unequivocal command for the Defendant to stop, criminal conduct would not occur if the Defendant did immediately stop. The State did not elicit any testimony to establish a reasonable sequence of events, and the Court is not in a position to assume any commands were ignored by the Defendant. However, the Court recognizes this instance is closer to meeting the statutory definition than the incident on the wheelchair ramp.

Under this same line of reasoning, the Defendant cannot be found guilty for the incident in the bathroom. If the Court were to accept Scholl's testimony in its entirety, then the testimony set out a specific timeline of events precluding culpability. According to Scholl, the Defendant blocked the doorway to the bathroom, placed his hands down Scholl's pants, and began touching her genitals. When Scholl told the Defendant to stop, he immediately disengaged and allowed Scholl to leave. As with the cases analyzing withdrawal of consent during a single event or a course of conduct, the criminal act occurs when the victim manifests a lack of consent and the defendant continues to engage in sexual contact. Here, the manifestation of Scholl's lack of consent successfully ended the contact.

Concerning the incident while Scholl was on the telephone, Scholl admitted she did not make any effort to tell the Defendant to stop. While Scholl explained this response as stemming from her unwillingness to put the parent of a client on hold, the law does not recognize this as a legal justification for eliminating the requirement of manifesting a lack of consent. The State did

41

not question Scholl on whether she was able to communicate her lack of consent nonverbally, thereby leaving the Court to question why Scholl did not make such efforts. The statutory definition requires Scholl to have manifested her lack of consent, and the Court was given no reason to do away with this requirement.

On the final incident, the one allegedly occurring in the basement, the circumstances were significantly different from the others. If the Court were to accept Scholl's testimony, then the statutory definition has been met. Scholl emphasized she refused to have sex with the Defendant *before* the sexual contact occurred, while opining the forcefulness of the encounter was due to her refusal. This creates a significant and reasonable implication the Defendant knew Scholl did not consent to the contact, yet the Defendant initiated the contact nonetheless. These facts, if believed, would meet the statutory definition.

### c. Credibility of the Witnesses

As the Defendant noted in his supplemental briefing, this case does not involve any physical evidence of the alleged crimes. There are no injuries, genetic materials, video or audio recordings, or even any eyewitnesses beyond the Defendant and Scholl. However, corroboration is not required to find proof beyond a reasonable doubt. The Court, as trier of fact, is entitled to make credibility determinations for each witness and to determine whether the witness is to be believed.

Having done so, the Court cannot accept Scholl's testimony sufficiently above the Defendant's testimony to provide proof beyond a reasonable doubt. While the Court is satisfied the Defendant specifically and intentionally preyed upon Scholl's emotional vulnerabilities, the use of questionable courting techniques is not in and of itself a crime. Furthermore, the Court believes Scholl when she testified she did not want the sexual relationship; the problem arises in

42

the nature of the proof, or lack thereof, established by the State. Because the State met the statutory definition applicable to the charged offenses on at least one incident – two at the absolute most – the Court's analysis must now turn upon credibility.

The Court found the Defendant to be of questionable moral character. However, guilt cannot rest upon evidence of one's character, but rather must derive from one's actions. The Defendant frankly admitted to the majority of the sexual encounters, only disputing the more predatory accounts. While the Court cannot accept the Defendant's testimony on Scholl's part in the relationship, particularly as having been an instigator and driving force behind the various encounters, self-serving fabrications in one aspect of testimony do not necessitate discounting the remainder of the testimony.

Conversely, the Court found Scholl's testimony remarkably compelling, and the Court has no doubt Scholl views her encounters with the Defendant as traumatic. Yet again, the problem arises in how the Court is permitted to accept and interpret Scholl's testimony. Without expert guidance, Scholl's coping mechanism is counterintuitive to the Court's lay understanding of how a non-consenting individual would respond to an unwelcome sexual contact. The Court is not in a position to understand how Scholl can transition from not consenting to the initial contact to maintaining her non-consent while admitting to engaging in further sexual activities with the Defendant, including placing the Defendant's penis in Scholl's mouth. The Court's confusion is further compounded by Scholl voluntarily supplying the Defendant with racy photographs of herself. Without more, the Court is left with considerable doubts as to the accuracy of Scholl's testimony.[104]

---

[104] Once again, the Court must note this is not a criticism of Scholl, but rather of the State's failure to provide expert testimony.

Given these concerns, one fundamental issue remains: if the Court cannot accept Scholl's version of events on the initial incidents, then it cannot accept her testimony on the final incident in the basement. Scholl cannot logically be credible and believable as to one incident while lacking in credibility and believability on the remaining incidents, barring some particular justification for the difference. The only evidence suggesting a change in circumstances was Scholl testifying she became more resolute and angry toward the end; however, this anger does not correlate with Scholl's willingness to go into the basement and her subsequent unwillingness to tell anyone about the incident until the hepatitis C scare.[105]

There remains one further problem with the relative credibility between the Defendant and Scholl. The Defendant, who was the last witness to testify, admitted to numerous sexual encounters beyond those discussed by Scholl. According to the Defendant, these encounters provided additional evidence of Scholl's part in continuing the relationship. These statements were never rebutted. The State declined to recall Scholl as a witness to explore whether these encounters happened and, if so, what circumstances may have existed. Instead, the State implicitly accepted the Defendant's testimony by offering no rebuttal evidence. Therefore, the Court has heard uncontroverted evidence of additional consensual sexual activities, without hearing so much as an insinuation of non-consent from Scholl on those instances. This evidence bolsters the likelihood of a consensual relationship existing between Scholl and the Defendant at some point in time, and the Court must use this evidence to evaluate the credibility of the witnesses.

---

[105] The law does not require a victim to abstain from engaging in acts that may expose the victim to further predation, nor does it require a victim to report the crime immediately. The Court is not blaming Scholl, nor is it suggesting Scholl had any obligations whatsoever with respect to the alleged incidents. The Court's sole focus is evaluating Scholl's stated emotions with her stated actions. Again, expert testimony may have been able to provide sufficient information to allow the Court to reach a different conclusion, yet no such testimony is in evidence.

44

The burden of proof in a criminal prosecution requires the State to prove each element of a charged offense beyond a reasonable doubt. When the Court is unable to elevate the testimony of one witness sufficiently above the testimony of another witness so as to resolve those reasonable doubts, the only lawful conclusion is to find the accused not guilty. In the case *sub judice*, the Defendant was not so wholly lacking in credibility, and Scholl was not so utterly credible, as to eliminate the Court's reasonable doubts. Even if the Court were to find the State to have met the statutory definition of "without consent" on all counts, provided the Court accepted Scholl's testimony, the testimony is sufficiently in equipoise as to require the Court to find in favor of the Defendant.

## FINDINGS OF THE COURT

Count I alleges the Defendant threatened to engage in conduct likely to result in the commission of a sexual offense against any person. The Defendant was alleged to have stated he was "fully capable of touching [Bufano's] breast," with the context of the conversation involving an implicit threat toward Bufano's employment. However, given the limited credibility of the Defendant and Bufano, the testimony heard by the Court on this matter was insufficient to provide proof beyond a reasonable doubt. Therefore, the Court finds the Defendant not guilty of Sexual Harassment.

Count III alleges the Defendant touched the breasts and/or buttocks of Bufano on September 21, 2009. However, as with the allegation of Sexual Harassment, the Court did not find Bufano's testimony sufficiently credible. At best, the evidence is in equipoise. Therefore, the Court finds the Defendant not guilty of Unlawful Sexual Contact in the Third Degree.

45

Count IV alleges the Defendant placed his penis on Scholl's face without her consent. The Court finds the Defendant did so place his penis against Scholl's face. This action was a sexual contact.[106] However, Scholl admitted to engaging in oral intercourse without objection. At most, Scholl immediately went into a passive state and did not respond in any manner whatsoever.[107] Without evidence of Scholl manifesting her lack of consent, the Court cannot find the State proved the contact occurred without Scholl's consent.[108] Therefore, the Court finds the Defendant not guilty of Unlawful Sexual Contact in the Third Degree.

Count V alleges the Defendant had vaginal sexual intercourse with Scholl on the wheelchair ramp and without Scholl's consent. The Defendant admitted to having vaginal sexual intercourse with Scholl on the wheelchair ramp. However, the Court does not find the State proved Scholl manifested her lack of consent.[109] Therefore, the Court finds the Defendant not guilty of Unlawful Sexual Contact in the Third Degree.

Count VI alleges the Defendant had vaginal sexual intercourse with Scholl while Scholl was on the telephone and the intercourse occurred without consent. The Court finds the Defendant approached Scholl, initiated sexual contact, and proceeded to have vaginal sexual intercourse with Scholl while Scholl was on the telephone with the parent of a client. However, Scholl made no effort to manifest her lack of consent, even nonverbally.[110] Therefore, the Court finds the Defendant not guilty of Unlawful Sexual Contact in the Third Degree.

---

[106] Sexual contact includes, *inter alia*, "[a]ny intentional touching of another person with the defendant's . . . genitalia[.]" 11 *Del. C.* § 761(f)(2).

[107] The State did not provide any expert testimony to explain what, if any, significance this reaction may have. Without the benefit of such testimony, the Court cannot presume this reaction left Scholl physically unable to manifest a lack of consent such that any desire to resist would have been futile.

[108] As discussed *supra*, this conclusion is based upon the statutory definition of "without consent," and not upon the Court's conclusion of whether Scholl did or did not, in fact, consent.

[109] While Scholl testified she said "no" at some point during the encounter, the lack of evidence regarding the timing, context, and manner of this statement fails to satisfy the State's burden under the statutory definition.

[110] During Scholl's testimony, she described the Defendant as approaching her and beginning to touch her inappropriately and to undress her. At this point, Scholl testified she "was like . . . I'm on the phone." The Court

Count VII alleges the Defendant placed his hand down Scholl's pants and touched her genitals within the vicinity of the bathroom at PWP and without Scholl's consent. The Court finds the Defendant blocked the door to the bathroom, placed his hand down Scholl's pants and, without consent, touched Scholl's genitals. However, this act occurred during an ongoing sexual relationship in which Scholl did not previously manifest a lack of consent. Furthermore, when Scholl told the Defendant to stop, the Defendant immediately complied, thereby creating a reasonable doubt the Defendant believed the contact was welcome and there had been no prior manifestation of a withdrawal of consent.[111] Therefore, the Court finds the Defendant not guilty of Unlawful Sexual Contact in the Third Degree.

Count VIII alleges the Defendant had vaginal sexual intercourse with Scholl, without Scholl's consent, in Jastrebski's office. The Court finds the Defendant had vaginal sexual intercourse with Scholl while in Jastrebski's office. However, the State failed to prove Scholl's utterances were sufficient to meet the statutory requirement of manifesting a lack of consent. Therefore, the Court finds the Defendant not guilty of Unlawful Sexual Contact in the Third Degree.

Count IX alleges the Defendant had oral sexual intercourse with Scholl, without Scholl's consent, in the basement of PWP. The Court does not find the testimony sufficiently credible to resolve the Court's reasonable doubts as to whether the incident transpired as alleged. Therefore, the Court finds the Defendant not guilty of Unlawful Sexual Contact in the Third Degree.

---

understood this testimony as intending to show the victim's state of disbelief at the time and not an actual communication to the Defendant. This is consistent with her testimony that she did not say or do anything to stop the Defendant because she was on the phone. As such, the Court cannot find the act occurred "without consent," as per the statutory definition, beyond a reasonable doubt.

[111] As noted *supra*, the Defendant is only liable for contact that persists after the manifestation of Scholl's lack of consent. Ceasing the contact after Scholl told the Defendant to stop, while in the context of an ongoing sexual relationship, precludes culpability under these circumstances.

# CONCLUSION

For the foregoing reasons, the Court finds the Defendant **NOT GUILTY** with respect to Counts I, III, IV, V, VI, VII, VIII, and IX.

The Honorable Carl C. Danberg
Judge

cc:     Diane Healy, Judicial Case Management Supervisor